and we have Mr. Wilson Badenik for Mr. Donziger. Good morning and may it please the court. I'm Scott Badenok Jr. for Appellant. The Bail Reform Act requires... Hold on, hold on. I just want to make sure Ms. Glavin is here and can hear. Okay, Ms. Glavin? Yes, Your Honor. I'm here. Good morning. Good morning. All right. Go ahead, Mr. Badenik. You have three minutes reserved for rebuttal. Thank you. The Bail Reform Act requires that a judicial officer impose only the least restrictive means necessary to reasonably assure a defendant's appearance at trial. The question presented to this court is whether the lower court committed clear error in imposing pretrial home confinement, given the facts here. Mr. Donziger, now on pretrial home confinement with an ankle monitor for 582 days, is a well-known environmental advocate with deep ties to the New York community where he has lived for 26 years with his wife and 14-year-old son. He owns a home in New York and is a U.S. citizen. He has no prior criminal record and has never fled from lawful authority, used aliases or fake passports. When the charges were filed against him, he was in Canada. At that time, he faced the potential for years in prison but voluntarily returned home to New York to face the charges. At the time of arraignment and on numerous occasions since then, Mr. Donziger offered further moral suasion in the form of 27 sophisticated signatories. Beyond the two, he had already secured for the significant $800,000 bond, including a CEO of a major nonprofit, numerous law – excuse me, yes? Can I ask you a question? You were – Please. – before this court back in February of last year on the same issue. I think Judge Parker was on the panel. And explain to me, other than obviously there's been more time than has passed, but what – you're saying that in terms of what's changed since that time, can you explain to me what's changed that we should be looking at? And I see that he violated the terms of his home confinement by going to – not going to Madison Square Garden, going to another place. So there's that issue, which I wanted to address. But what's – what are we looking at differently from February 2020 other than obviously the passage of time, which is significant? I'm not suggesting that's insignificant, but what are we looking at? Thank you, Judge Bianco. On May 18, 2020, 10 months after arraignment, the lower court officially reduced the charges to petty with a total maximum jail sentence of six months to be adjudicated at a bench trial without a jury. His assigned pretrial services officer on several occasions agreed to lesser restraints, and the lower court denied them. That suggests that it was the amount of jail time that was really the driving force behind the decision here. But if the view was he violated – she could conclude, look, there's a substantial evidence he violates court orders, that he doesn't respect the court or its orders, and he has significant ties to Ecuador. And so notwithstanding that you're looking at six months, he may just say, I'm not going to give the satisfaction of the court of finding me contempt and putting me in jail for any period of time. I don't want to go to jail for any period of time. I'm not hanging around. So the judge says I'm going to put him on home confinement or keep him on home confinement. Why is that an abuse of discretion? Mr. Donziger has fought these charges against him on every front, in every venue, never missing a court date in this case or any other. And he's amassed a dedicated pro bono team to advocate for him, including 50 Nobel laureates, hundreds of other lawyers, hundreds of law students. Mr. Badnack, excuse me, I'm not sure you're being as helpful as you could be. A point that you made early on in the argument that seems of some significance is when these charges were brought, Mr. Donziger was not in the United States. And at that time, at least in theory, there was no limit to the punishment that could be imposed on these contempt charges because there's no maximum sentence. Right? That is correct. And I think that is one of the strongest pieces. And he came back to the United States to face those charges and appear in court. That's correct. Second, is this not the first appeal that has come before this court of the bail conditions since the maximum penalty was capped at six months? Is that right or not right? Can you repeat that question, please, Judge? Is this not the first time that this court has been asked to review the bail conditions since the maximum penalty was capped at six months? I believe that is correct, Your Honor. Yes. You believe it's correct. I believe it's correct. I would think that's a rather significant fact. Instead of talking about what a hero this guy is with Nobel Prize winners backing him up, the thing that has changed, which is the question Judge Bianco led with here, is that when we upheld this home confinement before, he was facing very significant penalties. Now he is facing a maximum of six months.  And the question is, is he likely to flee, violating, jumping bail, and thus committing a felony, subjecting him again to a five-year maximum sentence, and in effect lifetime exile from the United States in order to avoid a six-month prison term? Is that not your argument? That is precisely my argument. Thank you, Judge Lynch. I couldn't have said it better myself. One, when he returned from Canada, he was facing upward of many years of penalties, but he showed up. And he's never missed a court date, as you well know. But when those charges were clarified, the idea that he was going to throw away 25 years of litigation that he's fought incredibly hard for in order to commit a felony to flee petty ones, that has always been illogical, Your Honor. And by the way, speaking of the six months, under the federal sentencing guidelines, you can be sentenced to home confinement for an offense where the guidelines recommend up to 14 months of imprisonment. Is that right? Yes, it is. If you don't know it, you should. All right. Under the sentencing guidelines, you could get a sentence of home confinement where home confinement would be substituted one day for one day for the prison sentence of up to 14 months. This man faces a jail sentence of a total of six months. I'm wondering, and I'm going to ask Ms. Glavin this, if he still can be subject to a bench trial, where in effect, or would he still be subject to a bench trial if the maximum sentence he could get was six months in prison plus two years of home confinement? Is that still a mere petty offense? I'm unclear about that, but we do take the lower court at their word that these are petty charges capped at a maximum of six months jail time. I'm wondering if six months would actually be a reasonable sentence after someone has served almost two years of home confinement while awaiting that sentence. I'm sure he wouldn't be given credit under the rules of the Bureau of Prisons. I understand that. But I'm a little bit concerned that we're saying he doesn't get a jury trial because this is such a petty offense that the worst that can happen to him is six months. When, in fact, it's going to be six months plus something that the sentencing guidelines treat as roughly, at least for petty offenses, the equivalent of two years in prison. That's correct. The distinction between serious and petty must mean something. And we take them at their word that this is a petty charge. But your point that he would have to commit a serious crime or several to flee petty ones when he's stuck around for 19 months does not make any sense. And given the non-speculative time that we know, the future time that we know, given the trials in May, that'll be 22 months of home confinement where if there is even a slight delay, that means two years of home confinement. USV Cutler is the main case to sort of look at here, where Bruce Cutler was flouting court orders on the steps of the court and he was sentenced to 90 days of home confinement. Mr. Donziger now has served six times that by the time of trial. So the idea that these restraints were necessary was never appropriate, but particularly when the charges were dropped from serious to petty. And it was at that moment that the lower court really needed to reapply their assessment of least restrictive means requirement and reduce the home detention and the ankle bracelet and give Mr. Donziger back the freedoms that most defendants who are facing petty charges with no criminal record would typically have. All right. Thank you, Mr. Glavin, you're up. Good morning, Your Honors. Rita Glavin for the United States. I represent the United States and appeal in the district court below. I want to take a couple of points head on. The first is this. One of the arguments that's being made is that Mr. Donziger has been fighting this case on every single front. Why would he give up his work of 25 years? Why would he end the fight for disbarment? There are two key facts that that remove that element from this. First, as Judge Lynch is aware, Mr. Donziger has now lost his appeals. Last week, there was a decision by the circuit court from the numerous civil contempt that Mr. Donziger, Judge Kaplan, found that Mr. Donziger had committed. All but one of those contempts were affirmed. The one that was not affirmed is the one that is important to Mr. Donziger. And that dealt with his ability to raise money off the Ecuadorian judgment that was procured by fraud, coercion, and bribery. And what the circuit said is the line ends here. There is no more working around an injunction. You cannot profit off this case that you've been profiting off of for the last four years, despite the injunction, and getting over $1.2 million, which you've largely paid yourself with. So with respect to risk of flight and the six months of imprisonment, what you're looking at here, Your Honors, is the fact that Mr. Donziger, the case that he has been working on for the last 24 years, it is now crystal clear that he cannot profit off of it and he cannot enforce it in the United States. There's a second key fact, which is very important here, which is that Mr. Donziger was disbarred by the appellate division of the First Department on August 5th of 2020, which happened after Judge Prescott's May 18th and June 3rd decisions on the release conditions. It was a per curiam opinion and it was five of the appellate division justices signing on to it. So this idea, why would Mr. Donziger flee for a six month prison sentence? Mr. Donziger, when he showed up and when he came into the United States from Canada, he did not have counsel, said that he did not understand. He wanted more time to assess the proceeding. I don't think Mr. Donziger appreciated what the seriousness of this was. When he came back into the country, he asked not to be able to surrender his passport. Now he appreciates the seriousness, right? And the seriousness is he could spend six months in jail. Yes, Your Honor. And one other issue that I want to- That's the maximum that he pays you. Yes, Your Honor. But I do want to- Are you aware of any precedent, any case where someone who was essentially being tried effectively in magistrate's court for a petty offense, something sub misdemeanor level, either in fact fled the country to avoid that or was subject to home confinement even after posting $800,000 in personal recognizance funds, which at least in the order it said had to be secured by $800,000 of actual value? Yes, Your Honor. Is there anybody who was facing a six-month petty offense charge who was, with that kind of security, that was found insufficient to keep him in the United States? No, Your Honor, but I have not encountered a defendant quite like Stephen Donziger, and I think that is the point here. The judge had to make an individualized determination on the 3142 factors, and what she had against the background is that Mr. Donziger, in Ecuador, with co-conspirators in Ecuador who are defaulted civil defendants in the case before Judge Kaplan, they were his co-conspirators. They had a secret bank account in Ecuador to make payments to procure a multibillion-dollar judgment through coercion, bribery, and corruption, of which Mr. Donziger expected to get hundreds of millions of dollars through a contingent fee interest. That's the first point I want to make. The second point I want to make is what then happened subsequent to that. There's an $800,000 supplemental judgment that this Court affirmed last week against Mr. Donziger. In addition to that, this Court affirmed last week the awarding of attorney's fees against Mr. Donziger for the numerous contempt motions. Those attorney's fees were $3.4 million, which will be readjusted based on the one contempt finding that the Court sent back. I also want to address the issue of the length of how long Mr. Donziger has been on home confinement. And when we talk about home confinement, let's be clear what this is. This is not pretrial detention. Mr. Donziger has been out of his apartment on over 100 outings. He has walked his son to and from school every single day that he has wanted to. He can leave his apartment as long as it's pre-approved by pretrial services. This is not a deprivation of due process. This is not the type of home confinement that the sentencing guidelines necessarily contemplate. But I want to go to the length of it. Wait, wait, excuse me. If he was actually sentenced to home confinement, he would not be able to leave the home with the permission of the probation officer? That, Your Honor, I don't know. Well, if you don't know, why are you telling me that that's different than this? You either know or you don't know. What I can tell you is I currently have a client who is serving a sentence of home confinement, and he's not allowed to leave for the activities that Mr. Donziger is being allowed to leave for. He would not be allowed to walk his child to and from school every day. He has been out to be able to go visit with his attorney. But I do think it is critically important to address the issue of why this has gone on as long as it has. There is no one who is responsible for this other than Mr. Donziger. Mr. Donziger is the one that asked for the June 15, 2020 trial date. There were other trial dates available to him to go forward that were earlier. They chose the June 15 trial date. We were ready to go to trial, the government, on June 15. Because of the pandemic and Mr. Donziger's lawyer going into the May 18 conference, Mr. Donziger's lawyer had written a letter saying it's impossible for us to go to trial. It's going to put everyone's health at risk. Judge Prescott agreed with that and kicked the trial to September 9. In the run-up to September 9, Mr. Donziger made at least three requests for adjournment of the September 9 trial date. It started in July. Judge Prescott denied it. It started again in August. Judge Prescott denied it. And it was only on September 4, on the eve of the trial going forward, after Mr. Donziger was down to two lawyers, after he refused to waive a potential conflict on two of his four lawyers, that Judge Prescott moved the trial to November because he had two lawyers, one of whom was refusing to show up for trial, and another who wasn't prepared to go forward with the trial on September 9. Judge Prescott then moved the trial. And what she had said previous to this was she wanted the trial to go forward because there was now a window, as you all remember in the fall, given the conditions of COVID in New York, to resume trials. She pushed it. She gave 70 days under speedy trial. This case was scheduled to go on November 4. And then there were at least five more motions to adjourn that trial date. That's all appreciated, Ms. Laven. But can you just recite what are the contempts that remain in the case that were affirmed civilly in the previous appeal? Yes. Your Honor, the civil contempts that were affirmed last week, four of them formed the basis for the criminal contempt charges. So count one of criminal contempt is Mr. Donziger's failure to provide a list to a forensic expert of all of his imaging and devices as he was directed. That was essentially a discovery dispute. I actually think it's more than a discovery dispute, Your Honor, and I would disagree with that. What has happened is that Mr. Donziger, throughout the course of the post-judgment proceedings, the discovery was based on both identifying assets to satisfy the $800,000 judgment as well as the Paragraph 5 compliance discovery. What Mr. Donziger did throughout the next year was not produce documents, not answer questions that he was supposed to answer during the course of this so assets could be identified. And he was doing it based on First Amendment grounds that had been rejected by Judge Kaplan over and over. During this period of time, Mr. Donziger, quite deliberately and strategically, did not ask for a stay from the Circuit Court of Appeals or ask for a name. It was found to be a contempt of court, but essentially what it is is he didn't turn over something he was supposed to turn over. So what's the second one? Yes. He was supposed to turn over his devices to a forensic expert, which he is still in violation of that order as we sit here today, and that presumably is going to go back to Judge Kaplan at some point because the discovery is still going on as far as I know. It was found to be a contempt of court. Yes. Number three is he refused to surrender his passport as a coercive sanction. Number four is that Mr. Donziger refused to assign, he subsequently has, but he refused to assign his 2011 rights to a contingency fee interest. Number five is his refusal to assign a 2017 contingency fee interest, a new one that he entered into after the RICO injudgment and was only discovered during the course of his deposition, and he had not produced, although it was responsive to a prior discovery request. And the last is that Mr. Donziger profited by selling a portion of his own contingency fee interest in the Ecuadorian judgment. Those are the six contempt charges. And those collectively, I take it it was over the government's objection that these were found to be petty offenses? Or did you agree with that characterization by the district court? No, Your Honor. We had informed when this was up before the Second Circuit in January and February before Judge Parker was on the panel, we had informed the district court in November that we did not plan to seek more than six months imprisonment. Judge Prescott didn't rule on that, but that was the position of special prosecutors. Okay, so however we might characterize each particular thing that's on that bill of particulars, the assessment of everyone is this is a petty offense. I think it is. If you're not seeking more than six months imprisonment, you're right. That is the definition, Your Honor. Well, but why are you only seeking? I mean, I understand that's the definition of petty offense, but at the same time, you know, you can have it both ways, can you? You sort of, on the one hand, want to make this seem like it's very serious conduct. But on the other hand, we're saying it's a petty offense. Judge Lynch, I think six months is a long time in jail. Yeah, it is. I wouldn't want to spend six months in jail. But you know what? Every time the government comes to court with some guy who's a drug dealer and says he's facing five or ten years in prison, they say that gives him a big incentive to flee because this is a serious crime and it would be really bad if he got away with this. And now we're talking about somebody who's charged with what is concededly a petty offense that will only, at most, get him six months in prison. We don't take the fact that this is a relatively small penalty compared to those others in assessing the likelihood of flight? Your Honor, this clearly is not a mandatory minimum offense. But I think six months in jail, in my own experience, is not an insubstantial amount of time. It's certainly a petty offense. But with respect to where we are in this case right now, Mr. Donziger is at the end of the line. Particularly given the court's decision last week, he can't afford this judgment in the United States. The records that he has refused to turn over and still refuses to turn over, he's now going to have to turn over. He is facing substantial monetary judgments against him and he's been disbarred. So I do disagree. He's better off in Uruguay. In what? He's better off in Uruguay. No, Ecuador, Your Honor. Ecuador, sorry. Yeah, and I do want to talk about that because I think that's important as well. He has extensive connections. There's a community for him in Ecuador. There always has been. It goes to his frequent travel there. He speaks Spanish fluently. He has relationships with community leaders and continuing relationships, certainly with the person that participated with him in his crimes to get that fraudulent judgment. This is a person that went to pretty extraordinary legal means to get a multibillion-dollar judgment that would enrich him by the tune of hundreds of millions of dollars. And he no longer can profit from it here. And we do believe him to be a flight risk. All your points are very well taken, and I understand that. This is a very unique case. I haven't seen anything like it, and I certainly hope that I don't again. But it is unusual, and he is an unusual defendant. This is not just a human rights attorney with lots of support. This is someone that committed serious crimes. He has been fighting in the United States, although at the same time violating court injunctions, repeatedly violating court orders. He's someone that hasn't demonstrated that he's worthy of trust, that he will do what he says he's going to do, and that his word is meaningful. And so the concern that Judge Preska has had throughout, and particularly back in May and in June, when it was just three months after the Second Circuit's decision, the concern she had is the trustworthiness of Mr. Donziger, and particularly after he breached the conditions of confinement. I take all of your points about the length of time, and I would encourage you to look at Judge Preska. She issued a recent decision on January 10, 2021, where she reluctantly granted the most recent adjournment request. It's docket number 242 in the district court. And what she did is, after Judge McMahon issued the standing order suspending jury trials, she asked the parties to confer about the January 19 trial date. And we had agreed to that trial date because Mr. Donziger finally was willing to get a New York lawyer to try the case, as opposed to the four around the country. We agreed to the January 19 trial date, and then considering the pandemic conditions, defense counsel wanted to put that off for some period of time. I would have preferred to have gone sooner, but I consented, you know, as an acknowledgment to what defense counsel wanted to do and the witnesses that were coming in to the May 10th date. Judge Preska did a lengthy decision on January 10th saying she's granting that reluctantly, given the amount of time that he has been on home confinement, and that she was quite surprised that Mr. Donziger had not wanted an immediate trial date. And one of the things about this is whether you can manipulate the sentence that you get by keep asking for adjournments and trial dates that go out and out now. And that's a real policy reason. I was not in favor of wanting to adjourn this. I would have liked this case to have gone last February. All right. Thank you, Mr. Clayton. Mr. Bond, if you have three minutes in rebuttal. Yes, I need to correct the record on several things. One, Mr. Donziger handed in his passport. So that's just patently incorrect. Second of all, on the record at arraignment, it is very clear that Mr. Donziger says this is serious and he admits that he's not a criminal lawyer. So he doesn't exactly understand. But he is very clear that it is serious. This is a man who's never missed a court date. How do they think he's going to miss this one? He suffered 19 months of home confinement. And just the last few months is when he's going to decide to run away. He has suffered six times what Bruce Cutler got post conviction, pre conviction. It is insane to think that at this point, a man who's fought at every single turn is suddenly going to run for the hills, go over eight time zones without his passport, mind you, and and flee forever for the for the risk of a Martha Stewart type of of run in jail. This is patently absurd. And it always has been when the case was dropped to petty. That was the moment that it is clear that the court made an error and should have said this person is no longer a flight risk. What's your response to Mr. Glavin's argument about the recent events in terms of the circuit decision? He's been disbarred that this is the end of the line and conditions. But what's your response to that? He is fighting disbarment in the New York Court of Appeals now. So to flee currently before that is heard and decided would also make no sense. This is a man who's fought all of this. He believes in his cause. He believes in these allegations. And I also believe that Judge Lynch and Judge Parker know that he is a fighter. He's not someone who runs away from these things. He's listening to this case right now. He's got hundreds of supporters right now who are listening in to make sure that justice is held here. A terrible precedent could be set by this ruling that any defendant with no criminal record whatsoever facing petty charges just because they have some international contacts could get detained pretrial. That is that is not what the Bail Reform Act stands for. And that is not what protecting personal liberties and the rights of defendants in courts mean. And that those are lodestars of the U.S. justice system. So what what Miss Glavin is asking us to do is extend pretrial detention to such and such an extent that most clear it is home detention. We're not talking about someone in the M.C.C. with raging covid. You're right, Judge Lynch. You're right levels of security. And Judge Lynch, you would also have to admit that getting 48 hour preapproval from Uncle Sam for every single action that you take and noting where you go and what you do and with whom. That is a very significant restraint, especially for someone who has never shown themselves to be a flight risk ever. Every single fact that the lower court and Miss Glavin has has heard has been construed negatively and innuendos and conjecture added on to those. I mean, the idea that these victims of corporate pollution in Ecuador are going to somehow harbor an international fugitive without any evidence. There's no email. There's no statement. There's absolutely nothing that shows that any of those people would be willing to do that or that Mr. Donziger is trying to flee. We also know that his bank accounts are frozen. How is he going to get there? How in the world is he going to get there? And the court and Miss Glavin both discounted these twenty seven sophisticated signatories, the level of moral suasion, which is really what we're trying to talk about here. The reasonableness of whether Mr. Donziger is going to stay here and not flee. That moral suasion has worked for everyone else in U.S. V. Mattis, two hundred and fifty thousand dollars. And these folks threw Molotov cocktails. They were the dangerousness prong, not the risk of flight. All right. I think we have. I think your time is up. All right. Thank you. Thank you, Your Honor. Miss Glavin will reserve the decision. Have a good day. Thank you, Your Honor. Thank you. Thank you very much. The last case on the calendar is on submission. Castro, the bank of New York Mellon. And we will also take the remainder of the motions calendar on submission. Thanks to Miss Rodriguez, our courtroom clerk and the court staff who helped us today. I would ask that court be adjourned. Court stands adjourned.